IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JOCELYN MORENO, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:24-cv-981 |
| | § | |
| DEALER INTEGRATED SERVICES LLC, | § | |
| | § | |
| Defendant. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Jocelyn Moreno ("Ms. Moreno" or "Plaintiff") files this Original Complaint against Dealer Integrated Services LLC ("Defendant").

## SUMMARY

1. Ms. Moreno worked for Defendant as a payroll administrator. She was discriminated against based on her pregnancy when Defendant terminated her employment because of coverage issues due to her impending maternity leave. She was also denied the full benefits of federally protected family and medical leave. Ms. Moreno was terminated in violation of the Family and Medical Leave Act and Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act of 1978.

## THE PARTIES AND JURISDICTION

2. Plaintiff Jocelyn Moreno is a natural person residing within the confines of the Southern District of Texas, Houston Division. Plaintiff has standing to file this lawsuit.

3. Defendant Dealer Integrated Services LLC is a Texas limited liability corporation conducting business in the Southern District of Texas, Houston Division.

4. Defendant may be served with this Complaint through its registered agent, Jonathan Chad Roberts, at 14511 Old Katy Road, Suite 200, Houston, TX 77079.

5.     The Court has subject matter jurisdiction over this case based on federal question jurisdiction under Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act of 1978.

6.     Venue is appropriate in the Southern District of Texas, Houston Division, because a substantial part of the events giving rise to the claims in this lawsuit occurred in this judicial district.

## FACTUAL BACKGROUND

7.     Defendant is a Houston-based business that provides an array of services to automotive dealerships.  Ms. Moreno was hired by Defendant around April 2017 and initially worked as a recruiter for about six months before transitioning into a human resources role.

8.     In 2018, Ms. Moreno received a promotion to Payroll Administrator.

9.     As one of the more tenured employees at the company, Ms. Moreno took on the responsibility of training and advising less experienced coworkers, including Valerie De la Cruz ("Ms. De la Cruz"), who worked in Accounts Receivable, and Patricia Mauricio ("Ms. Mauricio"), an Office Assistant in the Payroll Department.  In training situations in which Ms. Moreno was unsure of the correct answer to give to a co-worker, she would defer to the judgment of Defendant's owner, Johnathan Chad Roberts ("Mr. Roberts"), or Office Manager, Deborah Devine ("Ms. Devine").

10.     In addition to her work for Defendant, Ms. Moreno also performed payroll functions for three other companies owned by Mr. Roberts.

11.     Defendant generally had a strained work office culture, which came to a head when Ms. Moreno's impending absence during maternity leave was expected to create workload coverage issues.

12.     Defendant's attitude toward Ms. Moreno's maternity leave, set to coincide with her

expected due date in September 2023, was indicative of its discriminatory mindset.

13.     Ms. Moreno was unaware of her right to 12 weeks of maternity leave under the Family and Medical Leave Act ("FMLA").  Consequently, she only asked for a two-month leave.

14.     Defendant never provided Ms. Moreno with information on her FMLA rights and acted as though it was doing her a unique favor simply by allowing her to return to her job after a two-month break.  Mr. Roberts told Ms. Moreno that if she took three months off from work, Defendant could not hold her job open for such a lengthy period.  In the end, even Defendant's promise to allow Ms. Moreno this shorter maternity leave proved illusory.

15.     In the spring of 2023, Ms. Moreno's personal relationships with coworkers began to fray.

16.     Specifically, Ms. De la Cruz's relationship with Ms. Moreno began to deteriorate when Ms. De la Cruz learned through a surreptitious search of company records that Ms. Moreno was making more money than she was.  Ms. De la Cruz displayed undisguised resentment toward Ms. Moreno in the wake of this incident, including instances of passive-aggressive conduct in which Ms. De la Cruz would toss documents onto Ms. Moreno's desk and leave the room without saying a word.

17.     Despite the recalcitrance of her coworkers, Ms. Moreno continued her usual high standard of work.  She also persisted in her efforts to train Ms. Mauricio as well as Rachel Goins ("Ms. Goins"), an admin who worked out-of-state for another of Mr. Roberts's companies.

18.     Ms. Devine required Ms. Moreno to train Ms. Mauricio and Ms. Goins, in order to provide coverage during Ms. Moreno's maternity leave.  Ms. Moreno was required to teach not just the specific payroll functions necessary for coverage during her absence, but rather the totality of her job responsibilities.

19.     As Defendant's Office Manager, Ms. Devine hardly set a positive example for

harmonious collaboration and was indeed the primary cause of the office's toxic work environment.

20. This was magnified by Ms. Devine's tendency to withhold certain training to her subordinates out of an apparent fear that providing such knowledge would diminish her own value to the company. Text messages exchanged between office employees attest to the fact that Ms. Devine was widely seen as difficult to get along with.

21. By the end of 2021, Ms. Devine's misconduct required Mr. Roberts to consider terminating her employment. Although she was ultimately retained, Mr. Roberts did instruct Ms. Devine to spend about half her time working remotely for a period of several months in an effort to reduce tensions within the office.

22. In early 2023, Ms. Moreno met with Mr. Roberts and informed him that Ms. Devine was continuing to be rude to her. Seemingly at a loss as to how he could handle the situation, Mr. Roberts simply told Ms. Moreno to give Ms. Devine attitude back.

23. In April 2023, Ms. Mauricio tendered what would prove to be only a temporary resignation from Defendant and cited a toxic work environment as the cause of her decision to quit. At that time, Ms. Mauricio did not single out Ms. Moreno as the cause of her disgruntlement.

24. In a conversation with Ms. Moreno, Ms. Devine speculated as to the causes of Ms. Mauricio's decision to quit. Ms. Devine wondered out loud whether it was due to Ms. Mauricio's heavy workload or whether dysfunction between herself and Ms. Mauricio was the motivating factor.

25. In early May 2023, Ms. Moreno participated in a meeting with Ms. Devine, Mr. Roberts, and two operations managers in which Ms. Devine's suggestion of changing Defendant's payroll process to go 100% paperless was discussed. Ms. Devine invariably returned to the idea of modifying Ms. Moreno's payroll process in a thinly disguised power play whenever Ms. Devine

was particularly upset at Ms. Moreno.

26. After hearing feedback from Ms. Moreno concerning some drawbacks to Ms. Devine's proposal, Mr. Roberts accepted a compromise solution that would see only minimal changes to Ms. Moreno's established and effective payroll process that had been in place for years.

27. Matters came to a breaking point in an instance where Defendant alleges that Ms. Moreno eavesdropped on a private conversation between Ms. Devine and Ms. De la Cruz.

28. The reality of what transpired, late on Friday, June 23, 2023, was far more innocuous. Ms. Moreno had finished her work for the day and was waiting for her ride home when a package was delivered for Ms. Mauricio, who had already left the office. Ms. Moreno accepted delivery of the package and stopped by Ms. Mauricio's empty office to drop it off.

29. It was only then that Ms. Moreno overheard a conversation taking place in Mr. Roberts's next-door office through the thin office walls. Ms. Moreno was stunned to hear Ms. Devine and Ms. De la Cruz discussing plans to permanently replace Ms. Moreno. Ms. Devine speculated to Ms. De la Cruz that Ms. Mauricio was now ready to take over Ms. Moreno's payroll functions, and Ms. De la Cruz readily agreed. Ms. Moreno resolved to address her concerns about what she had heard with Mr. Roberts.

30. On Monday, June 26, 2023, Ms. Moreno sent a text message to Mr. Roberts seeking confirmation as to whether he would be in the office that day and expressing a desire to talk.

31. Ms. Moreno met with Mr. Roberts that afternoon and discussed her fear that Defendant, through the efforts of Ms. Devine, was actively seeking to replace her. Mr. Roberts claimed to be troubled by the allegations that Ms. Moreno raised and promised her that she would have her job back when she returned from maternity leave.

32. Mr. Roberts then set up a meeting with Ms. Moreno and Ms. Devine in the failed attempt to clear the air. Irate that her plot had been exposed, Ms. Devine launched into a litany of

unrelated grievances against Ms. Moreno. At some point, Mr. Roberts had to cut Ms. Devine off, asking her why she was bringing up irrelevant matters.

33. Mr. Roberts then called for an office staff meeting, which did not fare any better. The purpose of the staff meeting was to clarify office roles during Ms. Moreno's planned maternity leave.

34. Ms. Devine had unilaterally promised Ms. De la Cruz and Ms. Mauricio that each would receive a raise in the expectation that they would have increased workloads during Ms. Moreno's upcoming leave. Mr. Roberts would prove the bearer of bad news as he now informed Ms. De la Cruz and Ms. Mauricio that neither would be getting a raise.

35. On Friday, June 30, 2023, Ms. Devine instructed Ms. Moreno to stop by Mr. Roberts's office. Mr. Roberts cut directly to the chase, informing Ms. Moreno that her employment with Defendant was over because Ms. De la Cruz and Ms. Mauricio had each threatened to quit unless she was terminated.

36. As Ms. Moreno tried to reason with Mr. Roberts, she sensed that he was having second thoughts. Mr. Roberts only regained his resolve to go through with the termination when Ms. Devine interjected that she too would quit unless Ms. Moreno was fired.

37. Mr. Roberts explained to Ms. Moreno that Defendant could not afford to lose both Ms. De la Cruz and Ms. Mauricio at a time when Ms. Moreno's maternity leave was fast approaching.

38. Prior to Ms. Moreno's termination, she was never once written up by Defendant.

39. Defendant falsely promised Ms. Moreno that they would not contest her claim for unemployment benefits.

40. Defendant took advantage of Ms. Moreno's impending maternity leave to address its inter-office discord. In short, had she not been pregnant and on the cusp of maternity leave,

-6-

Ms. Moreno's termination would not have been justified and would not have occurred.

41.     Ms. Moreno was not actually the cause of friction in Defendant's workplace.

42.     If this were true, one would presume that Ms. Moreno's removal would have resulted in a significant boost to office morale.  This was not the case.

43.     Less than one month after the wrongful termination of Ms. Moreno, Ms. Mauricio resigned once again.  Unlike her earlier, short-lived bid to quit while Ms. Moreno was still gainfully employed by Defendant, this time Ms. Mauricio could not be talked into rescinding her decision.

44.     Ms. Moreno's termination violates the Family and Medical Leave Act and was discriminatory pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act of 1978.

## FMLA INTERFERENCE

45.     Plaintiff incorporates the prior paragraphs of this Complaint as if set forth verbatim.

46.     The Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et. seq.*, was enacted "to entitle employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition."  29 U.S.C. § 2601(b)(2).  Congress enacted the FMLA in response to concern over "inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods." *Miller v. AT & T Corp.*, 250 F.3d 820, 833 (4th Cir. 2001) (internal quotations omitted).

47.     "The FMLA has two distinct sets of provisions, which together seek to meet the needs of families and employees and to accommodate the legitimate interests of employers." *Hunt v. Rapides Healthcare Sys.*, LLC, 277 F.3d 757, 763 (5th Cir. 2001) (citing *Nero v. Indus. Molding Corp.*, 167 F.3d 921, 927 (5th Cir.1999); *Bocalbos v. Nat'l W. Life Ins. Co.*, 162 F.3d 379, 383

(5th Cir.1998)).

48.     The first set of provisions are prescriptive: they create a series of substantive rights, namely, the right to take up to twelve weeks of unpaid leave under certain circumstances.  *Id.*

49.     The second set of provisions are proscriptive: they bar employers from penalizing employees and other individuals for exercising their rights.  *Id.*; see also 29 U.S.C. § 2615(a)(1)-(2); *Chaffin v. John H. Carter Co.*, 179 F.3d 316, 319 (5th Cir. 1999); *Bocalbos*, 162 F.3d at 383 ("[T]he Act protects employees from interference with their leave as well as against discrimination or retaliation for exercising their rights.") (citations omitted); *Faris v. Williams WPC-I, Inc.*, 332 F.3d 316, 320-22 (5th Cir. 2003) (holding that there is a distinction between substantive FMLA rights and causes of action for retaliation designed to protect those rights).

50.     Defendant violated both the prescriptive and proscriptive provisions of the FMLA.

51.     Under 29 U.S.C. § 2615(a)(1), an employer cannot "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right" guaranteed by the FMLA.  *See Nero v. Industrial Molding Corp.*, 167 F.3d 921, 927 (5th Cir. 1999).  A plaintiff "must at least show that [the employer] interfered with, restrained, or denied her exercise or attempt to exercise FMLA rights, and that the violation prejudiced her."  *Cuellar v. Keppel Amfels, L.L.C.*, 731 F.3d 342, 347 (5th Cir. 2013).

52.     "In order to state a prima facie case of interference under the FMLA, an employee must demonstrate only that she was entitled to a benefit that was denied."  *Anderson v. New Orleans Jazz & Heritage Festival & Found., Inc.*, 464 F. Supp. 2d 562, 567 (E.D. La. 2006) (citing *Strickland v. Water Works & Sewer Board*, 239 F.3d 1199, 1206-07 (11th Cir. 2001) (citing *O'Connor v. PCA Family Health Plan, Inc.*, 200 F.3d 1349, 1353-54 (11th Cir. 2000); *King v. Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir.1999)).

53.     The FMLA provides that "an eligible employee shall be entitled to a total of 12

workweeks of leave during any 12-month period" for medical leave. 29 U.S.C. § 2612(a)(1).

54. "An employee generally has the right to be reinstated to [her] previous position or an equivalent position upon [her] return from FMLA leave." *Hester v. Bell-Textron, Inc.*, 11 F.4th 301, 306 (5th Cir. 2021) (citing 29 U.S.C. § 2614(a)(1)(A)-(B).

55. Ms. Moreno was not provided the 12 workweeks of leave that she was legally entitled to. Defendant never provided Ms. Moreno with information on her FMLA rights. Instead, Mr. Roberts told Ms. Moreno that if she took three months off from work, Defendant could not hold her job open for such a lengthy period. This directly contradicts the FMLA's mandate to provide job protection for leave up to 12 weeks. Defendant thus violated the FMLA's mandate that an employer not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right" guaranteed by the FMLA. 29 U.S.C. § 2615(a)(1); *Nero v. Industrial Molding Corp.*, 167 F.3d 921, 927 (5th Cir. 1999).

56. To state a prima facie FMLA interference claim, a plaintiff must demonstrate that (1) she was an eligible employee; (2) her employment was subject to FMLA requirements; (3) she was entitled to leave; (4) she gave proper notice of her intention to take FMLA leave; and (5) her employer denied her the benefits to which he was entitled under the FMLA. *Hester* at 306. Once the plaintiff states a prima facie claim, it is the employer's burden to articulate a legitimate, non-discriminatory reason for the employment action at issue, which then may be rebutted by the plaintiff by raising an issue of material fact that the employer's proffered reason is pretextual. *Id.*

57. Here, all five elements are met. Ms. Moreno was an FMLA eligible employee and Defendant was an FMLA covered employer. Ms. Moreno was entitled to leave and expressed her desire to take leave. She was denied the full benefits of her leave, including the full 12-week duration of leave and reinstatement. In addition, Defendant's proffered reason for terminating her is pretextual.

**FMLA RETALIATION**

58. Plaintiff incorporates the prior paragraphs of this Complaint as if set forth verbatim.

59. To make out a prima facie case for FMLA retaliation, a plaintiff must show that: "(1) she was protected under the FMLA; (2) she suffered an adverse employment decision; and either (3a) that she was treated less favorably than an employee who had not requested leave under the FMLA; or (3b) the adverse decision was made because she took FMLA leave." *Hunt*, 277 F.3d at 768 (internal citation omitted). After the plaintiff does so, the same burden-shifting scheme applies as does to the FMLA interference claim. *Hester* at 305.

60. An employee's request for leave is enough to establish the first element of her prima facie case. *Watkins v. Tregre*, 997 F.3d 275, 284 (5th Cir. 2021) (reversing summary judgment on FMLA retaliation claim).

61. The third element can be satisfied by showing that the plaintiff "was treated less favorably than an employee who had not requested leave under the FMLA or the adverse decision was made because [s]he sought protection under the FMLA." *Mauder v. Metropolitan Transit Auth. of Harris County, Texas*, 446 F.3d 574, 583 (5th Cir. 2006) (quoting *Hunt*, 277 F.3d at 768).

62. A plaintiff need not prove that the exercise of FMLA rights was the sole cause of the unfavorable treatment; "[t]he plaintiff is, however, required to show that the protected activity and the adverse employment action are not completely unrelated." *Mauder*, 446 F.3d at 583.

63. Temporal proximity alone can establish causal connection, the third element of an FMLA retaliation claim. *Id.*

64. Ms. Moreno (1) sought to take leave; (2) was terminated, and (3) her termination was not completely unrelated to her pending leave. She also was treated less favorably than employees who did not request leave. Furthermore, Defendant's reasons for terminating her are pretextual. Therefore, Ms. Moreno makes a case of FMLA retaliation.

## <u>TITLE VII CLAIM OF PREGNANCY DISCRIMINATION</u>

65.     Plaintiff incorporates the preceding paragraphs of this Complaint as if set forth verbatim.

66.     Title VII of the Civil Rights Act of 1964 prohibits discrimination "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."   42 U.S.C. § 2000e-2(a).

67.     In 1978, the Pregnancy Discrimination Act amended Title VII to include discrimination on the basis of pregnancy, childbirth, or related medical conditions within the composition of unlawful sex discrimination.  42 U.S.C. § 2000e-2(k).

68.     Discrimination can be established through direct or circumstantial evidence. *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003).  Where the plaintiff has not presented direct evidence of discrimination, courts apply the burden-shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under the framework, to establish a prima facie case of discrimination, a plaintiff must show that: "(1) the plaintiff is a member of a protected group; (2) the plaintiff was qualified for the job that was held; (3) the plaintiff was discharged; and (4) after the employer discharged the plaintiff, the employer filled the position with a person who is not a member of a protected group." *Black v. Pan Am. Labs., LLC*, 646 F.3d 254, 259 (5th Cir. 2011) (quoting *Valdez v. San Antonio Chamber of Commerce*, 974 F.2d 592, 596 (5th Cir. 1992)). Alternatively, in the case of disparate treatment, the plaintiff may satisfy the last element by showing that others similarly situated were treated more favorably.  *See Okoye v. Univ. of Tex. Hous. Health Sci. Ctr.*, 245 F.3d 507, 512–13 (5th Cir. 2001).

69.     After the plaintiff establishes a prima facie case, the burden shifts to the employer to show a legitimate, non-retaliatory reason for the adverse employment action.  *Black*, 646 F.3d at 259; *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007).

70. The burden then shifts back to the plaintiff to show either: "(1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic (mixed-motive[s] alternative)." *Black*, 646 F.3d at 259 (quoting *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004)) (alteration in original).

71. All conditions precedent to this suit have been fulfilled.

72. Ms. Moreno makes a prima facie case of pregnancy discrimination. She is a member of a protected group by virtue of her pregnancy; she was qualified for the job that she held; she was terminated; and she was treated objectively worse when compared to one or more similarly situated employees who were not pregnant.

73. Ms. Moreno's pregnancy is connected to her termination. Part of the thread that connects the two is Mr. Roberts's expression that Defendant could not hold her job open if she took three months of maternity leave, as well as the attendant issues with managing her workload while she was to be out on maternity leave.

74. Defendant's reason for her termination is pretextual. Among other things, the fact that Ms. Mauricio resigned for good less than one month after Ms. Moreno was terminated proves that Ms. Moreno was not in fact the true cause of workplace strife.

75. Plaintiffs who prevail in a Title VII discrimination claim are entitled to back pay. The purpose of back pay is to "make whole the injured party by placing that individual in the position he or she would have been in but for the discrimination. *Sellers v. Delgado Cmty. Coll.*, 839 F.2d 1132, 1136 (5th Cir. 1988).

76. Prevailing plaintiffs are also entitled to reinstatement as an equitable remedy. *See Julian v. City of Houston, Tex.*, 314 F.3d 721, 729 (5th Cir. 1992). If reinstatement is not feasible,

front pay will be awarded in a manner consistent with the remedial purposes of the law. *See Brunnemann v. Terra Int'l Inc.*, 975 F.2d 175, 180 (5th Cir. 1992). Unlike back pay, front pay refers to future lost earnings. *See, e.g.*, *Jackson v. Host Intern., Inc.*, 426 Fed. Appx. 215, 228 (5th Cir. 2011) (Fifth Circuit decision affirming front-pay award in a discrimination case); *Mota v. University of Tex. Houston Health Sci. Ctr.*, 261 F.3d 512, 527 (5th Cir. 2001) (same).

77. Prevailing plaintiffs are entitled to compensatory and punitive damages under Title VII. *See* 42 U.S.C. § 1981A(a)(1).

78. Prevailing plaintiffs are also entitled to attorneys' fees and costs and Plaintiff seeks to recoup these amounts.

## JURY DEMAND

79. Plaintiff demands a jury trial.

## DAMAGES AND PRAYER

Plaintiff asks that she be awarded a judgment against Defendant for the following:

a. Actual damages in the amount of lost back pay, lost benefits, and other economic losses;

b. Reinstatement or front-pay;

c. Liquidated damages;

d. Compensatory damages;

e. Punitive damages;

f. Pre-judgment and post-judgment interest;

g. Court costs;

h. Attorney's fees; and

i. All other relief to which Plaintiff is justly entitled.

Respectfully submitted,


 /s/ Ahad Khan
Ahad Khan
Texas Bar No. 24092624
S.D. Texas ID No. 2981398
712 Main Street, Suite 900
Houston, TX 77002
(713) 401-3558 – Telephone
ak@ahadkhanlaw.com – Email

ATTORNEY FOR PLAINTIFF
JOCELYN MORENO